**HARBOR INSURANCE COMPANY,**
Plaintiff,

v.

**SCHNABEL FOUNDATION COMPANY,**
et al., Defendants.

Civil Action No. 87–2212 (HHG).

United States District Court,
District of Columbia.

April 4, 1997.

Robert E. Heggestad, Heggestad & Weiss, Washington, DC, for Plaintiff.

Alexander W. Whitaker, Bethesda, MD, for Defendants.

## *Opinion*

HAROLD H. GREENE, District Judge.

This case was retried before the Court between plaintiff Harbor Insurance Company ("Harbor"), subrogee of OMNI Construction, Inc. ("OMNI"), and defendant Schnabel Foundation Company ("Schnabel"), OMNI's sheeting and shoring subcontractor, following a remand by the Court of Appeals.

## BACKGROUND AND PROCEDURAL HISTORY

This dispute revolves around damage to the restored nineteenth century structure at 633 Pennsylvania Avenue, N.W., Washington, D.C. owned by Sears, Roebuck & Company ("Sears Building") from the construction of an adjoining office building at 601 Pennsylvania Avenue. The damage occurred when the excavation and construction caused the ground under the Sears Building to settle. The crux of the dispute is whether Schnabel was negligent in designing and installing the sheeting and shoring system at the 601 Pennsylvania Avenue site (the "Project").

American Insurance Company ("American") was the primary liability insurance carrier, providing a maximum coverage of $300,000, and Harbor was the umbrella liability insurance carrier for both Westminster and OMNI. Both carriers, as subrogees of OMNI, originally brought this action for breach of contract and negligence against Schnabel and three co-defendants to recover monies paid under the respective policies to OMNI for liabilities incurred when the Sears Building was damaged. The case went to trial in June of 1990, and a jury returned a verdict in favor of Schnabel on all claims. The Court of Appeals reversed, holding that the Court erred in submitting Schnabel's contributory negligence to the jury because there was insufficient evidence to support such a finding by a reasonable jury.[1] The case was remanded for a new trial. The Court heard the case again [2]—this time without a jury—on April 22, 1996 through May 1, 1996.

After consideration of the testimony and exhibits introduced at trial, and the parties' briefs and post-trial material, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Any conclusions of law which constitute findings of fact and findings of fact which constitute conclusions of law shall be considered as having been determined accordingly.

## FINDINGS OF FACT

### I

On May 15, 1984, OMNI and Westminster Investing Corp. ("Westminster"), a real estate development company, entered into an agreement for the construction of a nine

---

1. As American did not seek any post-trial relief, it is no longer a party to this action. The other three co-defendants (Leo A. Daly Company, Hutchinson Brothers Excavation, Inc. and Division Two, Inc.) entered into a settlement agreement with Harbor and American but they remain parties to this action as cross-defendants on Schnabel's cross-claim for contribution and indemnity for all or part of the amounts found to be due to the plaintiff. A separate bench trial will be held on this issue given the Court's ruling in favor of the plaintiff.

2. The Court ruled that Harbor could not present its breach of contract claim in the retrial since it did not appeal the jury verdict against it on that claim.

story office building and underground parking garage at 601 Pennsylvania Avenue. The construction was to take place directly next to the Sears Building. One of the structures comprising the Sears Building complex—adjacent to the Project—was referred to as the Brady Building.

OMNI was Westminster's general contractor on the project. Westminster hired Leo A. Daly & Associates ("Daly") as the Project's Architect/Engineer. Daly generated the construction specifications and drawings for the Project. Westminster also hired Schnabel Engineering Associates ("SEA"), a geotechnical engineering firm, to analyze subsurface soil conditions at the Project. SEA produced three reports dated April 30, 1982, November 16, 1983, and January 23, 1984. The original SEA report provided the "recommended scope of excavation sheeting and underpinning, and criteria for design," as well as "geotechnical construction considerations that should be considered both in the design, and in the construction plans and specifications."

SEA made recommendations regarding the "sheeting and shoring" system—the system of support installed to retain the walls of the excavation and protect adjacent properties. The sheeting and shoring system ensures that material does not fall into the site during the excavation and that the adjoining earth and properties do not slip into the excavation site as it is dug. The report recommended that a "free draining sheeting system," using wood lagging and soldier piles, be used. Soldier piles are driven vertically into the earth spaced some distance apart, with wood lagging or boards placed between the soldier piles to hold the earth back. SEA recommended that the system be designed to a lateral earth retention criteria of 40H and that the construction should use two tiers of tiebacks to provide support for the system and to provide an underpinning for the Sears Building.[3] It was recom-

mended that these tiebacks be installed at a maximum angle of 30 degrees and that the anchors for these tiebacks penetrate the gravelly sand stratum rather than the soft clay layer below Pennsylvania Avenue. This was for a maximum height of excavation of twenty-six feet.

After this report was completed, plans for the Project changed when the building line was set back an additional twenty-five feet from the Brady Building. Due to this setback, Daly requested that SEA provide additional soils and geotechnical reports. In response, on November 16, 1983 SEA submitted an Amendment No. 1 to its previous report. The "Sheeting and Shoring" section recommended that steel sheet piling be installed for the wall of the excavation closest to the Sears Building. This steel sheeting would have eight foot of toe in below the new foundation level. Steel sheet piling consists of either Z or U shaped steel sheets which are driven into the ground with a pile driver. The sheets have an interlocking joint between them and as they are driven into the ground the sheets lock together. This minimizes or prevents clay or water from seeping through. In this amended report, SEA also recommended that tiebacks as outlined in the original report should be used.

OMNI did not perform the sheeting and shoring design or installation but solicited bids from subcontractors.[4] On March 23, 1984, Schnabel submitted a bid proposal for the design and construction of the sheeting and shoring system for the Project. OMNI provided Schnabel with the documents relating to the contract with Westminster, including the SEA reports, but as was its practice it did not require a design in accordance with these reports. Schnabel proposed a system employing steel H-beams and wood lagging on all sides with one tier of tiebacks, and a lateral earth retention of 30H.

---

3. Tiebacks are steel cables which provide lateral stabilization for the sheeting and shoring system and keep the soldier piles from moving.

4. Daly did not produce design criteria for the sheeting and shoring system, it merely stamped the proposal by Schnabel for conformance to the

overall design intent. OMNI did not employ any architects, engineers, or designers and undertook no technical review of the sheeting and shoring system. Instead, as was its usual practice, it relied on the expertise of the subcontractor Schnabel.

Schnabel's bid was accepted by OMNI and on May 29, 1984, OMNI entered into a subcontract agreement with Schnabel for a sheeting and shoring system based on Schnabel's bid proposal. OMNI also entered into subcontract agreements with Hutchinson Brothers Excavating Company, Inc. for excavation and Division Two, Inc. for dewatering.

Sears was also provided with information regarding the use of a wood lagging system nearest to the Sears Building. Sears hired its own engineering consultants to evaluate Schnabel's design. Sears' consulting engineers, Skidmore, Owings & Merrill ("Skidmore"), brought in STS Consultants, Ltd. ("STS") who completed a separate evaluation of the system designed by Schnabel. The report prepared by STS observed that the proposed system did not agree with the report of the geotechnical engineer. STS was concerned with the use of soldier beams and wood lagging and the use of only one level of tiebacks. It speculated that ground loss could occur during installation of tiebacks as well as a loss of ground from below the tieback level as the excavation progressed because the soft clay could squeeze between the soldier piles before wooden lagging boards could be placed to hold the clay back. It thought that the use of steel sheeting would minimize this effect. STS stated that when the excavation reached its deepest level—elevation 79—the building foundations would be in the "zone of influence" that the excavation would have on adjoining soils and that the soft clay would induce settlement from the excavation. Skidmore concurred with this analysis.

Sears forwarded the conclusions of both consultants to Westminster. Because Schnabel's proposal varied from the system recommended by SEA, Westminster sought evaluations of the proposal from Mueser–Rutledge, Johnston & Desimone ("Mueser–Rutledge") a geotechnical engineering consulting firm, and SEA. Mueser–Rutledge commented primarily on the effects of dewatering, but SEA submitted an evaluation of the sheeting and shoring system, this time after reviewing Schnabel's shop drawings. SEA predicted that settlement of one-quarter to one-half inch could be expected because of loss of ground between soldier piles as the clay moves into the excavation before the placement of the boards and the resulting movement of the whole sheeting and shoring system.

OMNI forwarded copies of the Sears' consultants reports to Schnabel. Despite the concerns these reports expressed, however, Schnabel informed OMNI on July 26, 1984 that its system was "the system required for the project and it will be installed in consideration of the Sears property." Pl. Exhibit 78. Charles Carey and Julius Wlaschin—registered engineers at Schnabel—designed a sheeting and shoring system in accordance with Schnabel's bid proposal.

Installation of the sheeting and shoring system commenced around August 2, 1984 (excavation of the Project site had begun on July 9, 1984). Schnabel drove steel H-beams along the Sears Building side of the excavation between August 2 and August 3. On August 12, 1984, Westminster and Sears entered into an agreement by which Sears granted OMNI and Westminster access to its property to install foundation tiebacks to support the walls of the Project excavation. Between August 20 and 23, 1984, excavation for the tieback anchors on the soldier piles next to the Sears Building was completed.

On August 23, 1984, a vertical crack was discovered at the upper right portion of the north face of the Sears Building. By August 24, 1984 data tracking the settlement indicated that the Sears Building had settled about one-half inch at this northeast corner. Although there was some concern expressed that this indicated horizontal motion of the soil, installation of the sheeting system continued. However, precautions were taken to minimize the damage. Additional tiebacks were installed at certain locations, including the far northeast corner of the site, as well as bracers at the base of some soldier beams.

At the beginning of November, the final excavation was made down to thirty-five feet below Pennsylvania Avenue. Just prior to the final excavation, points 13 and 14 (next to the Sears building) had settled a total of 1.5 inches. After the weekend of November 3 and 4, 1984 total settlement was measured at 2.1 inches on November 8. Thus, over the

weekend there was an additional three-eighths inch settlement at these two points. Settlement gradually increased. On December 6, 1984 Schnabel installed a system of steel braces to support the northeast corner. In the meantime, however, the Sears Building had sustained structural and cosmetic damage.

As a result of this damage, Sears, Westminster and OMNI entered into an agreement providing for repairs caused by the settlement. In a August 3, 1984 agreement Westminster agreed to indemnify Sears for damage caused to the Sears property during construction of the Project. By the terms of the main contract document, OMNI was required to reimburse Westminster for damage caused in whole or in part by the negligence of itself or a subcontractor.[5] OMNI repaired the Sears Building and submitted its claim to plaintiff. On December 13, 1988 this Court adjudged plaintiff liable to OMNI for $844,199.60 in addition to post-judgment interest, attorneys' fees and prejudgment interest. Harbor has paid OMNI almost one million dollars.

### CONCLUSIONS OF LAW

### II

Originally plaintiff's complaint alleged nine causes of action. Five remained after remand by the Court of Appeals. This Court ruled before the most recent trial that the plaintiff could not present its breach of contract claim because it did not appeal the jury's adverse determination on this issue from the first trial. *See* Memorandum and Order dated April 18, 1996.

■ With respect to the remaining professional negligence claim, plaintiff has the burden of establishing by a preponderance of the evidence (1) the applicable standard of care; (2) Schnabel's deviation from that standard; and (3) causal connection between the two. *Toy v. District of Columbia,* 549 A.2d 1, 6 (D.C.1988); *Bell v. Jones,* 523 A.2d 982, 988 (D.C.1986). The law of professional negligence restates the usual reasonable care standard. A professional must exercise the degree of skill and specialized knowledge as expected of a member of that profession acting under similar circumstances. *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C. 1979). Thus lawyers, accountants, doctors and other professionals must exercise that degree of reasonable care and skill which their peers would employ in that same situation. *Id.* This standard of care must be proved through expert testimony where the alleged negligent act is "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average layperson." *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C.1987). If a plaintiff fails to establish this standard of care, the trial court must direct a verdict for the defendant. *Meek v. Shepard,* 484 A.2d 579, 581 (D.C.1984).

■ The Court finds that the preponderance of the evidence reveals that Schnabel did not meet the standard of care either in the design or installation of its sheeting and shoring system, and that its negligence was the proximate cause of the damage to the Sears Building.[6]

Plaintiff's expert witness Richard Brown [7] testified that since early 1985 he had reviewed the data collected at the Project site, visited the construction area, and interviewed those involved with the Project (in excess of 950 hours over the part ten years). He

---

5. There was also an indemnification provision in the original contract documents—included by reference in the Subcontract agreement between OMNI and Schnabel—which provided that Schnabel would assume liability for damages caused by its own negligence.

6. Before the retrial, the Court held that the Court of Appeals' decision that there was insufficient evidence of contributory negligence would stand unless Schnabel introduced evidence that was "substantially different" from the evidence presented during the first trial. The evidence presented by Schnabel in the instant proceedings was not "substantially different" from the evidence first proffered by Schnabel on this issue. Consequently, the Court of Appeals' decision will stand.

7. Brown is a registered professional engineer with Virginia Geotechnical Services in Richmond, Virginia, a geotechnical consulting firm. He is the principal in charge of geotechnical engineering and construction monitoring services.

considered a variety of factors in assessing the efficacy of Schnabel's sheeting and shoring system, not just its use of soldier beams and wood lagging. He considered the soil conditions on Pennsylvania Avenue, the amount of toe in of the soldier piles, the size of the piles, the spacing of the soldier beams, and the number of levels of tiebacks. He also considered the nature of the Sears Building—the structure within the zone of influence behind the excavation which the system was intended to protect.

Brown's expert opinion was that the sheeting and shoring system designed and installed by OMNI was not adequate protection for the adjacent Sears Building. He researched a number of construction projects under similar conditions in the Pennsylvania Avenue area. Most importantly, he examined the sheeting and shoring systems for four excavations within the immediate vicinity and compared them to Schnabel's.[8] These four sites were 625 Indiana Avenue; the Canadian Embassy at 4th and Pennsylvania Avenue; the District of Columbia Courthouse at 6th and Indiana Avenue; and 1001 Pennsylvania Avenue at 10th and Pennsylvania Avenue.

Brown stated that Schnabel failed to meet the standard of care for a sheeting and shoring system along Pennsylvania Avenue because it did not incorporate in its design additional precautions to protect against settlement damage. From his research and experience, he concluded that such precautions are generally used when soldier beams and wood lagging are used in similar soil conditions adjacent to a property not underpinned and subject to settlement. These additional precautions—solid steel sheeting or slurry walls [9]—were not used by Schnabel

at this Project site. This failure was a significant factor which compromised the strength of the sheeting and shoring support system. In addition, the standard of care for the embedment of the soldier piles was at least five foot toe-in below the footing level and into good material. At comparable sites, this toe-in was between seven and twelve feet and all these projects utilized at least two levels of tiebacks.[10] By contrast, the average toe-in of the soldier piles at the Project was three and one-half feet and only one level of tiebacks was used.

Brown's opinion is supported by pile deflection data collected by OMNI after the August settlement which showed that the soldier beams had significant movement. OMNI's survey crews took readings on the soldier piles on August 23, 1984. They recorded a three to five inch movement of the soldier beams at the Sears property line. OMNI's field engineer determined that in late August the northeast corner of the building had settled one-half inch and the southeast corner had settled one-eighth inch. At this time the tiebacks had not yet been installed, but lagging boards had been placed for a nine foot height. The excavation was twenty-two feet deep. This supports Brown's conclusion that between August 20th and the 23rd or 24th, the soldier beams moved while they were acting in cantilever and because they did not have an adequate toe in to the sand and gravel.

With respect to the second settlement in November, the final excavation had begun and at this point the sheeting and shoring system was bearing the most pressure. The tiebacks were stressed to the maximum design load and were supporting the full thirty

---

8. These comparisons reveal that Mr. Brown's testimony was more than adequate to establish the standard of care for a sheeting and shoring subcontractor on Pennsylvania Avenue. In the cases cited by the defendant in which the expert was held not to sufficiently establish this standard of care, the expert relied merely on his own opinion by stating that he would have acted differently under similar circumstances. *See Meek v. Shepard,* 484 A.2d at 581. Mr. Brown clearly presented a standard of care based on how other subcontractors under similar conditions in this area design and install sheeting and shoring systems.

9. Slurry walls involve digging a trench in incremental sections. This trench is then filled with a heavy water mixture to prevent the excavation from collapsing as it is dug. Ultimately, the slurry wall becomes the actual foundation wall.

10. The comparable sites had toe-ins of seven feet (625 Indiana Avenue); twelve feet (Canadian Embassy); ten feet (1001 Pennsylvania Avenue); and nine feet (D.C. Courthouse).

five feet of soil. At this deeper elevation, Brown explained, the clay is softest and the largest amount of soil pushes the clay down and through the soldier beams. The evidence supports his conclusion that at this time the system was simply not strong enough to hold back this amount of soil pressure without giving. The tiebacks yielded, which allowed the soldier piles to move further and the soft clay to move past the piles before the lagging boards were put in place. As a result the earth underneath the buildings expanded laterally and the foundation of the Brady Building settled vertically.[11]

Independent evidence that the soldier piles deflected during the beginning of November supports Brown's conclusion. The movement of the soldier piles was measured by two different sources, by Fred Lifson for OMNI and by Steven Pennington for Schnabel. Steven Pennington began taking readings around August 25 after the first settlement. He took periodic measurements—roughly once a week—and provided this information to Mr. Wlaschin at the site. In contrast, OMNI's field engineer Fred Lifson took readings for OMNI every day, sometimes twice a day.

The pile deflection data taken by each, however, revealed different results. Both compilations showed an outward deflection of the wall during the third week of August when the initial settlement took place. The two compilations of data are close to identical through the end of August and through September and October. Between October 26th and November 9th a major difference in readings occurs again, especially with respect to soldier piles 66, 67, 71 and 73.[12] However, most of the movement which recorded by OMNI during this time period was from soldier piles 71, 72, and 73—the location near the northeast corner of the Brady Building where the largest amount of settlement occurred. For example for soldier pile 72, OMNI's data recorded a movement of 7.2 inches and for soldier pile 73, OMNI's data showed movement of 4.6 inches.

Because of the frequency and the care with which the measurements were taken by Lifson, the Court is convinced that OMNI's data is the most reliable indicator of soldier pile movement and as such demonstrates that the piles did indeed move during the November settlement. Furthermore, it is unlikely that OMNI's data are "stray" readings, as characterized by Dr. Cording. Fred Lifson took these readings by placing a baseline across the soldier piles and measuring the distance. Brown explained that if the baseline was disturbed or shifted, *all* the measurements would be likely to shift the same amount rather than record different readings. Furthermore it is undisputed—even by Schnabel and Dr. Cording—that displacements of the wall of three to five inches did occur during the August settlement.[13] And it is also agreed that displacements of two to seven inches—if OMNI's data is taken as reliable—would have evidenced a failure of the wall during the first weekend in November.

The Court is convinced by OMNI's data as well because the results of OMNI's tests comport with the predictions of almost all the engineering consultants who examined the system both before and after the August and

11. Schnabel's expert Dr. Cording found that this system met the standard of care because the design was modified to add toe braces and rakers and an extra level of tiebacks in one corner. However, at the time of the November settlement only two of the four toe braces had been installed (at piles 72 and 74).

12. Soldier piles 62 through 75 were directly east of the Sears building, and continuing up the corner were soldier piles 76 through 79. OMNI's data shows the following movements for these soldier piles for the period between October 25—November 9: 64 (1.7 inches), 65 (none), 66 (4.8 inches), 67 (5.3 inches), 68 and 69 (none), 70 (1.7 inches), 71 (2.5 inches), 72 (7.2 inches), 73 (4.6 inches).

There is no data by either surveyor for the weekend of November 3 and 4. In fact for the time period between October 25th and November 9th, readings were impossible for piles 74 and 75 because they were fitted with braces after being improperly embedded. And because of the difficulty in taking measurements at certain locations, there were no readings for piles 76 through 80, those in the corner closest to the Sears Building.

13. After this movement, the tiebacks were stressed and pulled the soldier piles two inches back into the excavation.

November settlements. After the August settlement, Mueser–Rutledge also believed that the initial settlement was caused by the movement of the soldier piles. In a letter dated September 21, 1984 Mueser–Rutledge concluded that with respect to the completion of the excavation to the full thirty-five feet, a five foot embedment of soldier piles as shown in Schnabel's drawings would not be enough to provide a reasonable safety factor against failure.[14]

And this was the conclusion reached by most of those on the scene after the two major settlements. After the November settlement, the Project's lead structural engineer Ellis Whitby visited the construction site. He testified that he could see that the soldier piles were tilted from the bottom outward to the top and that they were leaning into the excavation. In fact, Daly had to redesign the foundation wall because several piles in that location protruded into the reinforcing pattern. Even when the building was complete the soldier piles were still out of line—the piles adjacent to the Sears Building were four inches and eight inches into the foundation wall. This interference with the maximum thickness of the foundation wall also suggested to Mr. Forma, Westminster's development manager for the Project, that the piles had moved significantly during the weekend of November 3–4.[15]

It was Mr. Whitby's on-site opinion [16] that the sheeting and shoring system had moved inward. Immediately after the second settlement, he observed more evidence that the soldier beams had moved, namely the ap-

pearance of horizontal cracks along the cutback and at the bottom of the excavation. Whitby also observed that the soil adjacent to the toe of the piles had "heaved" up vertically. "Heaving" occurs when soil at the bottom of the excavation rises up due to the pressures developing against the wall and the soil penetrating around the wall. This kind of heaving is once again indicative of the movement of the soldier piles.

The Court finds that the cause of the movement of the soldier piles was the faulty design and installation of the sheeting and shoring system. First, the preponderance of the evidence demonstrated that during installation the soldier piles were driven to an insufficient depth and that they were driven into clay and not gravel. SEA had recommended that given the Brady Building setback the soldier beams should be driven seven to ten feet into the sand and gravel rather than five feet below the mat foundation as shown in Schnabel's drawings. After review of the Schnabel drawings, SEA recommended the soldier beams should be driven five feet into sand and gravel. However, Schnabel did not drive the piles to the tip elevation. After the first settlement, approximately August 24th, Schnabel checked the elevations of the soldier piles and discovered that they had not achieved a five foot depth. When Schnabel discovered the elevations of the piles had not met the required depth, it designed and installed toe rakers for these piles to ensure proper support. As of the settlement in November, however, only two

---

14. The opinion letter also stated

"The soldier pile top movements resulted because the bearing stresses in the clay just below the interim subgrade were sufficiently high to result in the gradual yielding in the clay. Movement occurred at a time when the soldier piles were acting in cantilever embedded in the clay and underlying sand and gravel prior to the installation of the tiebacks."
Pl.Ex. 264.m.
STS had offered a similar prediction in a report dated June 27, 1984. STS concluded that when the excavation reached elevation 79, the building foundations would be in the zone of influence that excavation would have on adjoining soils. At this point it was thought that the soft clay would almost certainly induce settlement.

15. Plaintiff introduced a memorandum to the file written by Mr. Forma in which he noted that at a November 6 meeting Henry Lucas, the principal engineer for STS, after interpreting the inclinometer data concluded that the primary cause of the weekend settlement was lateral movement of the soil. Pl.Ex. 177.

16. Whitby was a lead structural engineer of record for Daly. He was involved with the Project initially, but his involvement stepped up after the August settlement. He examined the Sears Building and compared the Schnabel design with the SEA recommendations. These conclusions were memorialized in a report finished in April of 1985, but he visually observed the signs indicating the movement of the soldier piles directly after the November settlement.

of these braces had been installed—at soldier piles 72 and 74.[17]

The inclinometer data does not compel a different conclusion. An inclinometer is a vertical tube drilled into the ground which allows a measuring device to be installed within it. At different intervals this measuring device is run down the tube to record any motions. At the Project site, STS and Skidmore took measurements from the inclinometers for Sears. The device was installed after the first settlement in August to record any movements in the soil.

Schnabel maintained that the measurements from the inclinometer between the excavation and the Brady Building showed no significant lateral soil movements during the first week of November. However, the inclinometers were not installed in the area where most of the movement of the soldier piles took place—in the northeast corner adjacent to the Sears' Building. Instead the inclinometer was located approximately six to eight feet from the Sears Building and twenty feet from the wall of the excavation. Thus the inclinometer could not have been expected to measure this lateral movement. It was positioned where the Sears Building itself was moving *downward* as the settlement took place. This data is not helpful in determining what was occurring at the northeast corner of the Brady Building. Furthermore, there were no readings done over the weekend of November 3rd and 4th—when the abrupt settlement took place—because the inclinometer required repairs.

The evidence also showed that the tiebacks failed and did not support the system when the final excavation was made and that this was a major cause of the November settlement.[18] Tiebacks consist of steel cables which have been drilled into the ground and grouted with concrete. They provide lateral stabilization for the sheeting and shoring system and keep the soldier piles from moving. They ensure that the sheeting and shoring system remains vertical and prevent it from tipping into the excavation due to the pressure from the earth on the opposite side.

Originally, SEA had recommended that the tieback anchors penetrate the sand and gravel layers and be installed at a maximum angle of 30 degrees. It warned that tiebacks should be installed in sand and gravel because when placed in clay they tend to slip and lose some of their holding power and may yield considerably at full design load. This type of installation also minimizes the length of the tiebacks. Because the greater strength in sand and gravel the tiebacks do not have to extend as far under the adjacent property's foundation.

The Court finds that the tiebacks were installed in clay and that this did not meet the standard of care for tieback installation given the other factors involved with this Project. Plaintiff's expert Brown testified that when a tieback starts pulling out of its hole, it causes a disturbance by softening and removing the clay around the anchor. This also affected the settlement of the Sears Building. Moreover since only one level of tiebacks was used for this system, the tiebacks were at a higher level in the soft clay under the Brady Building and were closer to its foundation. The tiebacks yielding would account for the movement of the soldier piles which occurred during the first weekend in November.

Although it was unclear from the shop drawings whether the tiebacks were intended

---

17. Schnabel contended that the soldier piles were installed incorrectly because of faulty site preparation by OMNI. OMNI laid out the entire building at the site and provided these elevation figures to Schnabel. Mr. Wlaschin—the Project Manager for Schnabel—testified that after the cut Schnabel discovered that the elevations of both the existing grounds and the depth of the cut were different than what had been presented on the shop drawings. The top of the soldier piles was to be elevation 98, but the actual site preparation varied from 98 to 100. Thus, some of the soldier piles were not embedded in the full amount in sand and gravel. However the testimony of Mr. Brown and Mr. Forma showed that Schnabel could have verified that the soldier piles were driven to the correct elevation—either visually or through simple mathematical calculations—and should have realized that they were not fully embedded.

18. The tiebacks had not been stressed at the time of the August settlement, although they had been installed.

to be anchored into clay,[19] the evidence indicates that the tiebacks were not installed in the sand and gravel stratum as Schnabel's shop drawings specified. This was the conclusion of almost everyone on the Project site, including Mr. Winter of SEA and Mr. Whitby of Daly. Even more persuasive is the evidence that a number of tiebacks near the settlement points were determined to have failed their proof tests. Brown testified that tiebacks would not have yielded so considerably unless they were installed in the soft clay stratum.

A tieback test is necessary to confirm that a tieback has sufficient anchorage to resist the load for which it was designed. At the Project site, Schnabel performed the tieback tests, and the results were observed and recorded by the Law Engineering Testing Company, an engineering company which provides inspection and testing services, retained by Westminster. During the tests tiebacks are pulled back with more load than the design requires—up to 120%—to make sure that the tieback is functioning properly. The load on the tieback is increased incrementally, and at each increment movement of the tieback is recorded. Measurements are taken to the thousandth of an inch, and are measured at certain intervals (i.e., one through ten minutes).[20] If a tieback exceeds the movement set forth in the test, it is considered to have failed and to be susceptible to creeping. To compensate for a failed

tieback, the tieback should be replaced or additional tiebacks should be installed.

The proof test set forth in Schnabel's design drawings provided that the allowable rate of movement in the last five minute interval of the test must be less than .01 inches (e.g., between five and ten minutes). The drawings also specified that any tieback which cannot be successfully tested to the loads required be incorporated into the sheeting using only one-half the load which it must hold without continuous movement.[21]

Applying this proof test to tiebacks 62 through 81 (the twenty tiebacks adjacent to and around the corner from the Sears Building), Brown concluded that twelve out of twenty tiebacks failed.[22] Schnabel did not, however, replace them and took no further action to compensate for the failure of the majority of these tiebacks.[23] Given these results, the only logical conclusion is that the tiebacks were anchored in the clay and that they yielded, causing the movement of the soldier piles. And as the tiebacks gave way, there was a resulting disturbance of the material underlying the Sears Building. This did not comport with a industry practice or meet the standard of care for tieback installation.

There was also evidence that Schnabel failed to meet the standard of care because only one layer of tiebacks was installed. Brown established that whether two levels of tiebacks are required depends on the total height of the excavation—from the top of the

19. There was evidence, however, that Schnabel intended the tiebacks be installed in clay. Julius Wlaschin—Schnabel's Project manager and representative at the site—testified at his deposition that he used a hollow stem auger precisely because it is a tool used for installing tiebacks in clay-like material. He claimed that he did not anticipate the installation in clay as being a problem because if the tiebacks had failed Schnabel could have changed the design or made them longer. Wlaschin Depo. 111–113.

20. The test can also be extended further to determine whether the yield decreases to an adequate level. Under the logarithmic cycle test, the same test is applied from over ten minutes and then from ten minutes to one hundred minutes, etc.

21. Mr. Wlaschin testified that Schnabel uses a .03 or .04 test and that the .01 test on the shop drawings was a typographical error. This seems

unlikely, however, given the fact that Schnabel has used this .01 inch change in the last five minute interval as the proof test at other sites and that it is also the standard outlined in an 1982 industry treatise on tiebacks authored by Harry Schnabel, Jr.

22. The same number of tiebacks (12) would have failed under the test outlined in the 1982 Federal Highway Administration's "Tieback Report," which requires no more than .03 inches of movement from one to five minutes. Even applying the test Dr. Cording approved—.08 inches within one to ten minutes—at least four tiebacks failed and more may have if the test had included a thirty second reading. Tiebacks 80 and 81 would be included in this group—and both were in the northeast corner of the Sears Building.

23. In fact, only one tieback—66—was replaced by Schnabel.

soil behind the soldier pile system down to the full excavation level. Brown testified that in the Washington D.C. area with similar soil conditions two levels of tiebacks are required for a total height of excavation of thirty-five feet, citing the four comparable sites.[24] If two levels of tiebacks are used, one tieback is not stressed to full design load but shares the strain with the second level. He concluded that a soldier beam and wood lagging system with six foot spacing of the beams but with only one level of tiebacks did not meet the standard of care for the design of a sheeting and shoring system along Pennsylvania Avenue.

■ Schnabel contended that these were not the cause of the settlement of the Sears' Building. Instead, it argued that the dewatering process undertaken by the subcontractors caused the resulting settlement damage to the Sears Building. Dewatering was required at the Project because the excavation was thirty-five feet deep with three levels of parking under the building. Without such treatment, the excavation would have filled with water. OMNI hired Division Two, owned by President George King, as the dewatering subcontractor. Dewatering an excavation site can cause settlement because water is removed from the sand stratum of earth. This removal can force the clay level above the sand or gravel to compress and consolidate, resulting in settlement. As a result, dewatering wells have to be properly filtered and screened so that soil material is not pumped out of the excavation. The existing water levels at the site have to be examined to determine whether the lowering of the water level would induce soil consolidation.

Three deep water wells were eventually used at the Project. The controversy surrounded dewatering well # 5 ("DW–5"). After several of the engineering consultants voiced concern about the initial placement of DW–5, it was relocated to approximately twenty-seven feet from the northeast corner of the Brady Building. This placed DW–5 outside and to the east of the sheeting and shoring system. Schnabel contended that the placement of DW–5 was a cause of the settlement because it was so close to the excavation.

After the initial settlement, there were meetings concerning the location of the well and the possible loss of fines (minute particles of soil) from the dewatering process. When fines are pumped out of an excavation, crevices are left between larger chunks of material. Once the fines are pumped, consolidation or compression of the soil results. However there was no evidence which would indicate that fines had been pumped out of the excavation. After an inquiry made by Mr. Forma, SEA arranged for laboratory tests of the water taken from the wells. No presence of fines was found. In a letter dated May 14, 1995, SEA concluded that only minute amounts of fines were lost and advised Westminster that loss of fines was of "no consequence" to the settlement movements which had been observed.

DW–5 was turned off during the last week in August right after the initial settlement and damage to the Sears building. After the second settlement, STS concluded that it was the lateral movement of the soil, not the dewatering process, that was the major cause of the settlement. Furthermore, testimony at the trial showed that settlement related to dewatering operations normally occurs over days and weeks—not abruptly as in this case. In addition there were no similar settlements at points equidistant from DW–5. If drawdown from the other two wells was the cause of the settlement, it would be expected to cause similar settlements at points which were at equal distances from DW–5 (i.e., settlement points 13 and 15).

Before Schnabel even installed the system, Westminster's consultants Mueser–Rutledge believed that the impact of dewatering would be minimal. In an opinion letter to Westminster on April 23, 1984, Mueser–Rutledge concluded that drawdown due to dewatering was not expected to be a problem because sufficient dewatering had been done previously in the soils in that area during con-

---

24. The excavation heights at the comparable sites were: thirty-four feet at 625 Indiana Avenue; thirty-one feet at the Canadian Embassy; thirty-six feet at the D.C. Courthouse; and thirty-eight feet at 1001 Pennsylvania Avenue.

struction of the Washington Metro. It concluded that only a quarter to one-half inch of settlement would result from dewatering. It also advised that the use of steel sheeting would not provide any more protection than the use of soldier piles and wood lagging—the minimal effect from dewatering would be the same.

From the onset of the Project it was understood by the parties that dewatering would result in settlement of one-eighth to one-quarter inch but that settlement would be uniform and it would not damage the Sears Building. Uniform settlement would not cause damage because the entire building—at all points—would move vertically downward at the same time. As expected, settlement of about one-eighth inch had occurred at all monitoring points around the building by August 18th.

In short, then, plaintiff has met its burden on its professional negligence claim. The evidence presented by the plaintiff was sufficient to show that Schnabel failed to meet the standard of care required for subcontractors installing sheeting and shoring systems along the Pennsylvania Avenue corridor. The expert testimony was equally convincing in establishing this standard of care. And as explained in detail above, the plaintiff demonstrated a causal connection between Schnabel's breach of care and the damage to the Sears Building, most specifically by showing how the soldier pile movement and yielding of the tiebacks installed in clay caused the settlement.

Plaintiff also established that Schnabel's negligence was the proximate cause of the damage to the Sears Building. "To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *District of Columbia v. Watkins,* 684 A.2d 395, 402 (D.C.1996) (quoting *Psychiatric Institute of Wash. v. Allen,* 509 A.2d 619, 624 (D.C.1986)). Although the evidence adduced at trial suggested several other factors which may have influenced the settlement of the Sears Building—including effects from dewatering and regrading the slope—it is clear that the soldier beam and wood lagging system designed and installed by Schnabel "played a substantial part in bringing about" the settlement and damage to the Sears Building. *Sanders v. Wright,* 642 A.2d 847, 848 (D.C.1994). The evidence satisfies plaintiff's burden on proximate cause.

In any event the Subcontract imposes liability for damage to the Sears Building on Schnabel resulting in whole or in part from Schnabel's negligence. Article 6.c. provides:

> If, as a result, in whole or in part, of negligence ... of Subcontractor, his employees, agents, or lower-tier Subcontractors ... any property is damaged, lost or destroyed, Subcontractor assumes the liability therefor and agrees to hold OMNI ... and [its] sureties harmless therefor.

Pl.Ex. 47.

The Subcontract also referred back to the original contract documents. In Article 1.b. the Subcontract stated that "Subcontractor shall assume all obligations, risks and responsibilities which OMNI has assumed towards Owner in the Contract Documents." Pl.Ex. 47.

Pursuant to the agreement signed between OMNI and Westminster, OMNI agreed to indemnify and hold harmless the Owner and Architect of the Project from all claims and damages "arising out of or resulting from the performance of the work, provided that any such claim ... is caused in whole or in part by negligent act or omission of the Contractor, any Subcontractor ... or anyone by whose acts any of them may be liable, regardless of whether or not it is caused by a party indemnified hereunder." Pl.Ex. 42. Again, this provision is included by reference in the Subcontract. Thus Schnabel had a duty to indemnify OMNI if the damage to the Sears Building resulted in some part from its own negligence. Given the Court's finding that Schnabel's negligence caused the damage, and rejecting any contributory negligence on the part of OMNI, by the clear terms of the contract Schnabel must indemnify OMNI for the damages it incurred.

## III

### *Damages*

 Given this finding of liability, the only issue left for the Court to determine is the amount of damages for which Schnabel is liable. Plaintiff Harbor, as an insurer which has paid the full amount of its insured's loss, is subrogated to the full extent of the insured's claim against the responsible party. *Link Aviation, Inc. v. Downs*, 325 F.2d 613, 614 (D.C.Cir.1963). Subrogation is the substitution of one person for another in litigating a claim, demand, or right—the substituted party succeeds to the rights of the other. 11 John Alan Appleman and Jean Appleman, Insurance Law and Practice § 6501 (1981). The subrogee is entitled to the amount paid to the insured, but is not entitled to be unjustly enriched by receiving money in excess of what it actually paid. *Beacon Bowl v. Wisconsin Electric Power Company*, 176 Wis.2d 740, 501 N.W.2d 788, 801 (1993).

On December 13, 1988 this Court adjudged Harbor liable to OMNI for $844,-199.60, plus post-judgment interest, attorneys' fees and prejudgment interest. Harbor and American paid OMNI as part of reimbursement of its claims a 10% charge for overhead ($90,910.14) and a fee of 7.5% ($75,000.86). Harbor also paid OMNI $65,904.31 in prejudgment interest. Of the total amount of damages, $1,144,-199.50, American paid OMNI $300,000 and Harbor paid $844,119.60. Harbor also seeks $613,045.00 in attorneys' fees. The total amount of damages paid by Harbor to OMNI was $1,030,727.17.

During the first trial, Harbor and Schnabel stipulated that $978,208.60 was the reasonable cost of repairs to the Sears Building. However this agreement fell apart after the Court of Appeals reversed the jury verdict from the first trial. American had sought damages of $300,000, the amount it paid OMNI on OMNI's claim, but did not file an appeal from the final judgment in Schnabel's favor and is no longer a plaintiff in this action. As a result, Schnabel contends that the stipulated damages must be reduced by $300,000.

Two issues must be resolved by the Court: (1) whether plaintiff Harbor is entitled to recover the amounts it seeks over and above the stipulated reasonable cost of repairs; (2) how to deduct the $300,000 now that American is no longer a party to this case.

As agreed during the trial, the Court has made its finding of liability and will now decide these two issues with respect to damages. However since no evidence was presented at the second trial regarding damages, and given the Court's pretrial ruling disallowing Harbor's contract claim, the Court will require submissions by both parties as to the amount of damages which should be awarded. After the Court receives briefing on this issue, in accordance with the schedule set forth in the accompanying Order, the Court will promptly enter judgment for Harbor in the appropriate amount.