**Donald C. MEEK, M.D., Appellant,**

v.

**Delphine SHEPARD, et al., Appellees.**

**No. 82–1397.**

District of Columbia Court of Appeals.

Argued Sept. 24, 1984.

Decided Nov. 30, 1984.

Steven A. Hamilton, Rockville, Md., for appellant.

James R. Stoner, Washington, D.C., for appellees. William R. Voltz, Washington, D.C., was on brief for appellees.

Before PRYOR, Chief Judge, and NEBEKER and TERRY, Associate Judges.

TERRY, Associate Judge:

In this medical malpractice action a doctor appeals from a Superior Court judgment on a verdict in favor of his patient. We hold that because the plaintiff, Mrs. Shepard, offered no evidence of the standard of care owed to her by Dr. Meek, she failed to establish a prima facie case. Consequently, we must reverse the trial court's denial of the doctor's motion for a directed verdict and remand with directions to enter judgment for Dr. Meek.[1]

### I

In her fifth month of pregnancy, Mrs. Delphine Shepard began to experience a leakage of fluid down her legs. When she called her obstetrician, Dr. Donald Meek, and described her symptoms, he advised her to go to a nearby clinic to be tested for a possible urinary tract infection.[2] The test results came back positive, so Dr. Meek prescribed an antibiotic. The leakage continued intermittently until the evening of the next day.

Later that night, around 1:00 a.m., Mrs. Shepard began to discharge blood. · The bleeding soon became "heavy," according to her testimony, and she began to have severe abdominal pains as well. When she called Dr. Meek at Sibley Hospital, he reassured her but told her to call back later if the bleeding increased. She waited a short time, but because the pains continued, she felt it would be advisable to go to the hospital. Mrs. Shepard's husband drove her to Sibley Hospital, which was several miles from their home in suburban Maryland. After examining her and conducting certain tests, Dr. Meek concluded that her vaginal bleeding and abdominal pain, as well as her fever of 101.9 degrees, were caused by the urinary tract infection. He therefore prescribed a stronger antibiotic and sent her home with her husband.[3]

A few hours later, because the pains did not go away, Mr. and Mrs. Shepard decided to go back to the hospital. On the way Mrs. Shepard suffered a miscarriage in the car. Mr. Shepard drove immediately to Georgetown University Hospital, the nearest hospital at the time, where Mrs. Shepard received emergency treatment. Dr. Meek was then called, and Mrs. Shepard was transported to Sibley Hospital for further treatment, including a dilatation and curettage.

Thereafter Mr. and Mrs. Shepard filed this suit alleging that Dr. Meek was negligent in discharging her from the hospital when she first went there in the middle of the night. The complaint alleged that because of the doctor's negligence, Mrs. Shepard was forced to have her miscarriage in the car instead of a hospital. Mrs. Shepard sought damages for the physical pain and emotional injury caused by Dr. Meek's alleged negligence; Mr. Shepard sought damages for his emotional injury

---

1. Appellant raises several other issues on appeal, which we do not reach in light of our holding that appellee failed to prove her case.

2. Mrs. Shepard had a history of such infections.

3. Dr. Meek testified that he found no evidence of heavy bleeding; even eight hours later, when Mrs. Shepard returned to the hospital, her blood count had not measurably declined.

and for loss of consortium. It was conceded by all parties that the miscarriage could not have been prevented.

## II

 The plaintiff in a medical malpractice case bears the burden of proof on three issues: the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury. *Morrison v. MacNamara*, 407 A.2d 555, 560 (D.C.1979); *Haven v. Randolph*, 161 U.S.App.D.C. 150, 151, 494 F.2d 1069, 1070 (1974); *Kosberg v. Washington Hospital Center, Inc.*, 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968). Thus, at the outset, the plaintiff must establish through expert testimony [4] the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances. *Morrison v. MacNamara, supra*, 407 A.2d at 560–565; *Robbins v. Footer*, 179 U.S.App. D.C. 389, 392–396, 553 F.2d 123, 126–130 (1977). Because doctors do not and cannot guarantee results, the mistakes that a particular doctor makes are not actionable unless they cause the doctor's performance to fall below the applicable standard of care. *Smith v. Reitman*, 128 U.S.App.D.C. 352, 353, 389 F.2d 303, 304 (1967). Therefore, if the plaintiff fails to establish the standard of care in a medical malpractice case, the trial court must direct a verdict for the defendant. *Haven v. Randolph, supra*, 161 U.S.App.D.C. at 151, 494 F.2d at 1070; *Kosberg v. Washington Hospital Center, Inc., supra*, 129 U.S.App.D.C. at 324, 394 F.2d at 949; *Smith v. Reitman, supra*, 128

U.S.App.D.C. at 353, 389 F.2d at 304; *Quick v. Thurston*, 110 U.S.App.D.C. 169, 171, 290 F.2d 360, 362 (1961) (en banc).

Mrs. Shepard's evidence, even when viewed in the light most favorable to her,[5] clearly "failed to clear the first hurdle of establishing the standard of care." *Haven v. Randolph, supra*, 161 U.S.App.D.C. at 151, 494 F.2d at 1070. Her expert witness, Dr. Leslie Iffy, never testified as to the standard of care, but rather stated only what he would do under similar circumstances. When counsel asked him a long hypothetical question which assumed many facts similar to those presented in Mrs. Shepard's testimony, Dr. Iffy replied, after stressing that the hypothetical included heavy bleeding:

> I would be inclined to say that when I see a patient who has heavy bleeding, then I would be inclined to consider that would be a course for hospital admission.

When asked if the fact that the woman in the hypothetical had a fever of 101.9 degrees had any bearing on his answer, he said:

> Under the circumstances and against the background of significant bleeding that we already mentioned, that would be an additional reason that would make me bend towards hospitalization.

In explaining his conclusion, Dr. Iffy once again stated that the symptoms set forth in the hypothetical would "induce me to hospitalize this patient." On cross-examination he characterized his direct testimony by saying, "I stated what my interpretation of heavy bleeding would be and what I would

---

**4.** The standard of care in medical malpractice cases must ordinarily be proven by expert testimony. *Sponaugle v. Pre-Term, Inc.*, 411 A.2d 366, 368 (D.C.1980); *Haven v. Randolph, supra*; *Kosberg v. Washington Hospital Center, Inc., supra*, 129 U.S.App.D.C. at 324, 394 F.2d at 949. Only when a lay person, relying on common knowledge and experience, can find that the harm would not have occurred in the absence of negligence may the standard be established without the aid of an expert. *Washington Hospital Center v. Martin*, 454 A.2d 306, 308 (D.C. 1982); *Harris v. Cafritz Memorial Hospital*, 364

A.2d 135, 137 (D.C.1976), *cert. denied*, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977).

**5.** On a motion for directed verdict, the trial court must view the evidence in the light most favorable to the party against whom the verdict is sought. *Bauman v. Sragow*, 308 A.2d 243, 244 (D.C.1973). In reviewing the denial of such a motion, we must apply the same standard. *Papanicolas v. Group Hospitalization, Inc.*, 434 A.2d 403, 404 (D.C.1981).

do on that interpretation of mine." The cross-examination concluded:

Q. If I understand what you are saying in this particular case, Doctor, it is that if you have heavy bleeding and had detected heavy bleeding, then you would have hospitalized her, but the fact that Doctor Meek, based upon his knowledge of Mrs. Shepard and his three pelvic examinations that morning did not hospitalize her, that is not in and of itself a violation of the standard of care; am I correct?

A. No, it is not.

Q. So, you are not saying that Doctor Meek deviated from the standard of care; am I correct?

A. I didn't say that—no.

■ On redirect Dr. Iffy described his earlier answer to the hypothetical question: "I think that I stated that assuming that there was a substantial amount of hemorrhage, I would have considered hospitalization desirable—yes, I did." The questioning continued:

Q. And your opinion is—

A. Under the hypothetical situation—yes.

Q. —that there was a deviation; is that correct?

A. If the bleeding was substantial, profuse probably is the word that should be used then profuse then—it—then the patient should have been hospitalized.

This last response was the first and only time that Dr. Iffy even appeared to render an opinion regarding the standard of care without qualifying it by saying what he himself would do. Of course, at the same time, by his own testimony a few sentences earlier, he was simply restating his prior testimony, in which he said only what he would do if confronted with the patient in the hypothetical question. From Dr. Iffy's

6. Our discussion has focused entirely on Mrs. Shepard, but our holding applies to Mr. Shepard also. Since his claim for damages was wholly

testimony (and there was no other evidence on this point) no reasonable juror could have determined what the standard of care was.

Without sufficient proof of the standard of care, Mrs. Shepard's case should never have gone to the jury. *Rodgers v. Lawson,* 83 U.S.App.D.C. 281, 284, 170 F.2d 157, 160 (1948); *Hazen v. Mullen,* 59 App.D.C. 3, 32 F.2d 394 (1929). We therefore reverse the judgment and remand this case to the trial court with directions to grant Dr. Meek's motion for a directed verdict.[6]

*Reversed and remanded.*

derivative and dependent on hers, a directed verdict must be entered against Mr. Shepard as well.