**DISTRICT OF COLUMBIA, Appellant,**

v.

**Linda WILSON, Appellee.**

No. 96–CV–1394.

District of Columbia Court of Appeals.

Argued Oct. 15, 1998.
Decided Dec. 17, 1998.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant.

Johnny M. Howard, Washington, DC, for appellee.

Before TERRY, SCHWELB, and REID, Associate Judges.

SCHWELB, Associate Judge:

On July 28, 1992, Russell Brown, who was serving a sentence as a youthful offender[1] at the Lorton Youth Center, died of asthma. On July 27, 1993, Brown's mother, Linda Wilson, brought this action against the District of Columbia, pursuant to the wrongful death[2] and survival[3] statutes, alleging medical malpractice and other negligence. The case went to trial on March 25, 1996, and on April 2, 1996, the jury returned a verdict in the plaintiff's favor in the amount of $277,418.[4] On August 22, 1996, the judge denied the District's post-trial motion to set the verdict aside. The District now appeals, claiming evidentiary insufficiency and instructional error. We affirm.

## I.

## THE SUFFICIENCY OF THE EVIDENCE

### A. Russell Brown's illness and death.

The evidence, viewed in the light most favorable to the plaintiff, see, e.g., District of Columbia v. Watkins, 684 A.2d 395, 401 (D.C.1996), reveals that the decedent had suffered from asthma since birth. At the time of his death, Brown had been incarcer-

ated at the Youth Center for approximately one year. There was evidence that Brown had suffered four attacks of asthma during the summer of 1991 and four more in 1992.

On July 12, 1992, following one of these attacks, Brown was treated at D.C. General Hospital. The physicians at that institution recommended that Brown's prior treatment with Theophylline, a bronchodilator,[5] be continued, and that he should also receive Prednisone, an anti-inflammatory steroid, which had been beneficial to him in the past. Brown was returned to the Youth Center, but Prednisone was not administered to him.

During the night of July 27–28, 1992, Brown suffered another, and more severe, asthma attack. After some delay, which the plaintiff ascribed to allegedly inadequate training of correctional personnel and negligence on the part of unlicensed foreign medical graduates who were assisting in his treatment, but which the District attributed to Brown's own negligence, Brown was taken to the Youth Center's infirmary, where he collapsed. Brown was then transported by ambulance to the nearest emergency facility, DeWitt Army Hospital at Fort Belvoir, but he died on the morning of July 28 of bronchial asthma. He was twenty-three years old.

### B. The expert testimony.

#### (1) Dr. Michael D. Cohen

At trial, the plaintiff introduced the expert testimony of Michael D. Cohen, M.D., a board-certified pediatrician[6] with extensive experience in the provision of health services at correctional facilities.[7] According to Dr. Cohen,

---

1. See the District of Columbia Youth Rehabilitation Act, D.C.Code §§ 24–801 et seq. (1996).

2. D.C.Code § 16–2701 (1997).

3. D.C.Code § 12–101 (1995).

4. The jury found in favor of the District on Ms. Wilson's separate claim based on 42 U.S.C. § 1983 (1994).

5. A bronchodilator is a medication used to enlarge the small airways in an asthma patient's lungs.

6. Dr. Cohen testified that he had special training in the treatment of children, adolescents, and young adults.

7. Dr. Cohen testified in considerable detail regarding what he believed to have been negligence on the part of medical and other personnel at the Youth Center. We confine our discussion to those aspects of Dr. Cohen's testimony that inform our disposition of this appeal.

the management of [Brown's] asthma essentially from the time he entered the facility until he died was inadequate and that both in terms of the chronic management of his asthma throughout the little more than one year he was there was not effective or adequate and in particular the management of his more serious asthma attacks which occurred during the weeks preceding his death was inadequate and the management of his severe, life-threatening asthma attack on the morning of July 28 was inadequate and as a consequence he died.

Dr. Cohen testified that asthma is "one of the more common chronic illnesses, particularly in young people, and is the cause of a significant amount of morbidity and mortality that public health authorities feel is preventable through more aggressive treatment." He explained that the unfavorable effects of asthma can generally be controlled, and that the applicable standard of care [8] therefore required a proactive and preventive approach to the treatment and management of the disease. Dr. Cohen found no evidence, however, that such a proactive approach had been used at the Youth Center in the treatment of prisoners who were suffering from asthma. On the contrary, the care provided to Brown and others was entirely reactive.

Dr. Cohen pointed out that the treatment protocol which was in use at the Youth Center made no provision for the care of asthma patients "at times other than when they're having what's been called an acute asthma attack." Indeed, the medical staff at the Youth Center

did not appear to be taking a preventive approach at all. You know, I tried to distinguish between what I would call episodic care, where care is provided only when the patient is sick or seeks help, versus what I would call continuous care, where the health service, particularly with a chronic asthmatic who is having recur-

rent and severe attacks, seeks to follow the patient closely, adjust [his] medication in such a way as to achieve the optimum benefits that are possible from the available types of medication and assesses the response to treatment, both clinically by listening to the chest and objectively by obtaining peak-flow rates. None of this was done at this facility.

According to Dr. Cohen, the standard of care in effect in 1992 [9] required correctional institutions to have "specific times when patients with serious chronic illness[es] are seen and evaluated according to a specific protocol." In particular, "[t]here should be regular scheduled follow-up of every serious asthmatic. At least every three months if they're stable. Certainly more often if they're not stable." Brown, however, "was seen apparently only at his own initiative, and specific care was supplied only at those times." Moreover, Brown's medical records contained little or no information reflecting "any education of the patient regarding the nature of his disease or how to control it, or the seriousness of it, or how to use his medication, or opportunities for additional treatment that might be available." Dr. Cohen's apparent point was that the lack of patient education predictably inhibited the exercise of initiative on Brown's part.

Dr. Cohen testified that the lack of a preventive treatment plan was further reflected by the absence from Brown's medical records of any "detailed history regarding the severity of his illness, whether he had been hospitalized, whether he needed intensive care, whether he'd ... needed steroid prescriptions in the past, no history regarding the possibility of an allergic component, no history regarding what types of circumstances precipitated his attacks or made his asthma worse." Dr. Cohen explained that a complete history is essential as "a guideline for the treating health professionals as to the severity of the individual's disease," and be-

---

8. The District's criticisms of the sources upon which Dr. Cohen predicated his description of the standard of care are discussed in Part I D(3), *infra*.

9. Dr. Cohen testified generally that "[t]he standard of care I would say includes patient edu-

cation, control of environmental factors that contribute to the disease, appropriate use of medications, and also the use of objective measures of the severity of disease and response to treatment."

cause it "gives them their first essential information about how to manage the patient's disease."

Another critical factor in the management of asthma, according to Dr. Cohen, is "the objective measurement of the severity of the airway narrowing" in the lung. One effective and widely available means of measuring the patient's lung function is a "peak flow meter," a device that costs approximately twenty-two dollars. Dr. Cohen testified that the standard of care in 1992 "certainly" required "any physician who treats asthma to have a peak flow meter that can be used to assess his asthmatic patients." [10]

Dr. Cohen also testified that several foreign medical graduates, two of whom had treated the decedent, had been practicing as physician assistants at the Youth Center even though they were not licensed or certified for such work and had not completed the requisite accredited training programs. Eight months before Brown's death, the Department of Corrections (DOC) had issued its "Foreign Medical Graduate Guidelines," which provided that foreign medical graduates were authorized to "perform administrative tasks that comply with the District of Columbia's licensing regulations," but that they were not permitted to provide "direct patient care in the form of examination, diagnosis, and treatment of patients." *See* Division Operations Procedure (DOP) 6049 (Nov. 18, 1991). Dr. Cohen stated that these guidelines were, "in essence," consistent with the standard of care as it existed in 1992. He testified that, contrary to the guidelines, "the unlicensed foreign medical graduates ... were providing direct patient care."

Dr. Cohen was also of the opinion that the physicians and foreign medical graduates who worked on Brown's case on the day before he died provided the wrong treatment:

The record indicates that Mr. Brown was not given oxygen initially on his arrival at the clinic. I think that was an error. The record indicates, after Mr. Brown collapsed, that they attempted to resuscitate using a bag and mask ventilation and they made no attempt to intubate him. In order to ventilate an asthmatic who is collapsed and not breathing due to an asthma attack, I think it is absolutely necessary to intubate in order to ventilate effectively.

The allegedly negligent treatment of Brown did not end, according to Dr. Cohen, with the failure to administer oxygen. Dr. Cohen testified that, under the applicable standard of care, the ambulance that transported Brown to DeWitt Army Hospital on July 28, 1992 should have been, but was not,

staffed with people who were trained—properly trained and certified as either advanced EMTs or paramedics to manage a life-threatening emergency of this type and it should have contained the equipment necessary to manage a life-threatening emergency of this type, which would include the ability to intubate the patient, the ability to ventilate the patient effectively, equipment for monitoring the cardiac—cardiac monitoring status to take the electrocardiogram to show the electrical activity of the heart and the ability to defibrillate or shock the heart in order to make it start beating again, if it has already stopped beating.

Finally, addressing the issue of causation, Dr. Cohen testified that Brown's death could and should have been avoided:

Q. Now, Doctor, all of the failures and violations of the various standards of care that you've articulated in the courtroom today, do you have an opinion, based upon a reasonable degree of [certainty], whether or not those violations were a substantial factor in the death of Russell Brown?

A. Yes, I believe this was a wholly preventable death. Had this inmate received adequate asthma care during the months leading up to his fatal asthma episode and, indeed, even if he had received adequate care for his two prior attacks on July 2nd and July 12th ... death would likely not have happened at all. And, further, if he had received timely health services during

**10.** There was testimony that a "rights flow meter" was available at the clinic and that this device is "essentially the same thing" as a peak flow meter. Brown's records contained no notation, however, that a "rights flow meter" had ever been used to assess his condition.

the night when the condition was worsening . . ., his life very likely could have been saved.

#### (2) *Dr. Jack E. Nissim.*

The District called as its expert witness Jack E. Nissim, M.D., a board-certified specialist in pulmonary medicine. Dr. Nissim disagreed with many of Dr. Cohen's conclusions. He testified that in his opinion, the care given to Russell Brown satisfied the applicable standard of care for the treatment of asthma patients. In Dr. Nissim's view, Brown contributed to his own death by overuse of his inhaler, which led Brown to underestimate the severity of the final asthma attack that took his life, and which therefore caused Brown to wait too long to request medical assistance. Indeed, Dr. Nissim's testimony, if accepted by the jury, would have provided ample basis for a finding that the District was not responsible for Brown's death.[11]

Dr. Nissim acknowledged, however, that Brown's medical records, although "acceptable," contained no comprehensive review of his condition. In Dr. Nissim's opinion, it was "reasonable to expect" that Brown would have benefited from a "comprehensive" approach to his treatment if such an approach had been instituted "at a time before his last . . . attack, but not the day of his last attack." Dr. Nissim also testified that Brown would have derived some benefit from an objective measurement of his peak flow.

#### C. *The trial judge's decision.*

After the plaintiff rested her case, the District moved for judgment as a matter of law (JMOL) on the ground that Dr. Cohen had failed to articulate a national standard of care. The trial judge denied the motion.

At the close of all of the evidence, the District renewed its motion for judgment. The judge again found the evidence of a national standard sufficient to go to the jury:

> Actually, in this case, there were words that referred to community standards and national standards which referred to it, national accepted references.
>
> But, even without that, the law does not require a particular incantation.
>
> It requires a clear reference to a national or widely-held standard as opposed to a local [one] or one's own practice.
>
> My observation of the evidence is that [this] was done here, although not in the formal terms.

After the jury returned a verdict in Ms. Wilson's favor, the District filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, and reiterated its claim that the plaintiff's expert testimony was insufficient. The trial judge again rejected the District's contention:

> Plaintiff's expert, in articulating the applicable national standard of care, discussed the 1991 "Full Report for Guidelines for the Diagnosis and Management of Asthma" as well as various memoranda, general orders, consent decrees and special master's reports regarding standards of care provided to District of Columbia inmates with serious medical needs. . . . Viewing the testimony in a light most favorable to the plaintiff, there is sufficient evidence to support the jury's finding that the defendant was negligent.

#### D. *Legal discussion.*

#### (1) *The standard of review.*

■ The question whether the trial judge properly allowed the case to go to the jury is one of law, and we review *de novo* the judge's denial of the District's motion for judgment notwithstanding the verdict. *See Phillips v. District of Columbia*, 714 A.2d 768, 772 (D.C.1998). "A judgment notwithstanding the verdict is proper only in 'extreme' cases, in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict for that party." *District of Columbia v. Cooper*, 445 A.2d 652, 655 (D.C.1982) (en banc); *Watkins, supra*, 684 A.2d at 401; *see also Shewmaker v. Capital Transit Co.*, 79

---

11. Because the jury apparently credited Dr. Cohen's analysis over Dr. Nissim's, we do not set forth the latter's testimony in detail.

U.S.App. D.C. 102, 103, 143 F.2d 142, 143 (1944) (explicating standard).

### (2) *The elements of the claim.*

■ "In an action for negligence, the plaintiff has the burden of proving[, by a preponderance of the evidence,] the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the plaintiff's injury." *Watkins, supra,* 684 A.2d at 401 (citations omitted). In medical malpractice cases, proof of the standard of care and of its breach ordinarily requires expert testimony. *Meek v. Shepard,* 484 A.2d 579, 581 n. 4 (D.C.1984). Specifically, "the plaintiff must establish through expert testimony the course of action that a reasonably prudent doctor with the defendant's specialty would have taken under the same or similar circumstances." *Id.* at 581.

■ "The personal opinion of the testifying expert as to what he or she would do in a particular case, without reference to a standard of care, is insufficient to prove the applicable standard of care." *Travers v. District of Columbia,* 672 A.2d 566, 568 (D.C. 1996); *Meek, supra,* 484 A.2d at 581; *see also Hazen v. Mullen,* 59 App. D.C. 3, 5, 32 F.2d 394, 396 (1929). A medical malpractice defendant's conduct is measured by a national standard, rather than by a local one. *Capitol Hill Hosp. v. Jones,* 532 A.2d 89, 93 (D.C.1987); *Watkins, supra,* 684 A.2d at 401.

■ In the District of Columbia, the DOC has statutory responsibility, *inter alia,* for the safekeeping, care and protection of its prisoners. *See* D.C.Code § 24–442 (1996); *Herbert v. District of Columbia,* 716 A.2d 196, 198 (D.C.1998) (en banc). Section 24–442 codifies the common law rule, which requires correctional authorities to exercise reasonable care in carrying out their obligations. *Id.* We have held that physicians at Lorton "owe the same standard of care to prisoners as physicians owe to private patients generally." *District of Columbia v. Mitchell,* 533 A.2d 629, 648 (D.C.1987). "The fact that negligence and malpractice are alleged to have taken place in jail [rather than in a private facility] makes no difference." *Id.* (citations omitted).

### (3) *The foundation for Dr. Cohen's opinion.*

The District contends that Dr. Cohen expressed only his personal opinion regarding the treatment of Brown at the Youth Center, and that his testimony therefore did not establish a national standard of care against which the performance of the District's employees could be measured. We do not agree.

■ In support of his fundamental thesis that the District's treatment of Brown's asthma was merely reactive, and that the standard of care required a proactive and preventive approach, including, *inter alia,* a detailed medical history, education of the patient, and measurement of peak flow, Dr. Cohen relied primarily on the Guidelines for the Diagnosis and Management of Asthma ("Asthma Guidelines") which were issued in August 1991 by the Public Health Service of the United States Department of Health and Human Services. Dr. Cohen testified that the Asthma Guidelines were distributed to every physician in the United States, and that they represented a consensus among experts on asthma regarding the appropriate treatment of the disease. Dr. Cohen acknowledged that the Asthma Guidelines had not been *uniformly* adopted by *all* hospitals or medical providers, but he emphatically rejected the suggestion by counsel for the District that their issuance constituted an abrupt departure from the prior standard of care:

> No, that's not right. It didn't represent a change. It represented a consensus among experts as to *what the standard of care was at that time.* The change was that someone was making an effort to communicate this widely to all practicing physicians in order to make wide improvements in the care of asthma.

(Emphasis added.) Dr. Cohen added that

> I don't view [the Asthma Guidelines] as an ideal. They largely represent what I was taught in my residency training beginning in 1979. Particularly with respect to the use of [a] peak flow [meter] and then sub-

sequently what I learned in the course of the '80's regarding the use of anti-inflammatory agents.[12]

■ Although Dr. Cohen relied primarily on the Asthma Guidelines as the basis for his description of the applicable standard of care, he cited a number of other authorities as well. He stated that the DOC's "division operating procedures," issued on January 15, 1991, called for a written "treatment plan" for "special needs" patients, including chronic asthmatics such as Russell Brown. Dr. Cohen reiterated that although Brown's records contained "treatment plans that address his immediate needs at any particular visit," there was no "overall plan for [the] overall management of [his] chronic [asthma]." [13] Further, in relation to the use of unlicensed foreign graduates as physician assistants, Dr. Cohen testified that

> the standards both of the American Correctional Association [ACA], the National Commission on Correctional Health Care [NCCHC] and the American Public Health Association [APHA] standards for health services in correctional institutions, and I would say also practice in most communities in the nation with respect to health services for any person, all require that health professionals be licensed or certified. Licensed in the jurisdiction in which they're practicing and certified by the professional association of the profession which they're practicing.[14]

**12.** In describing the Asthma Guidelines, Dr. Cohen also used the phrase "consensus statement that represents the state of the art at that time." The italicized language quoted above demonstrates, however, that the witness was not using the term "state of the art" as a reference to startling new medical advances. Rather, he was focusing on the standard of care then in existence, as reflected in a consensus of experts on the disease. At the very least, this interpretation of the phrase is the appropriate one if we view the record, as we must, in the light most favorable to the plaintiff.

**13.** For reasons which we have recently explained in some detail, see, e.g., Clark v. District of Columbia, 708 A.2d 632, 636 (D.C.1997), the DOC's internal procedures cannot and do not embody the standard of care. We have held, however, that such procedures may properly be received

*(4) The applicable case law.*

■ We are satisfied that Dr. Cohen's expert testimony, summarized above, was sufficient to establish the standard of care, a breach of that standard, and proximate cause. This conclusion is inescapable if one compares the record in this case with the evidence which we have held to be sufficient in other medical malpractice cases brought by prison inmates against the District of Columbia.

In *District of Columbia v. Mitchell, supra,* a prisoner at Lorton alleged that physicians employed by the District were negligent in treating an infection which had developed at a surgical site following a hernia operation. The plaintiff's expert witness, David Robb, M.D., was asked whether the treating physicians "used that degree of skill which is expected of a reasonably competent institution in the same or similar circumstances." 533 A.2d at 649. Dr. Robb replied: "I believe the level of care was below the competence that could be expected in a situation like this." *Id.* He added that although the physicians had treated the patient, it was his opinion that they had not done so aggressively enough. There is nothing in the court's opinion to suggest that Dr. Robb identified specific facilities at which a higher level of care was practiced, and there is no indication that he brought to the attention of the jury any specific standards promulgated by professional associations, or that he quoted from any publications or other medical authorities.

in evidence as "bearing on the standard of care." *See, e.g., Washington Metro. Area Transit Auth. v. Jeanty,* 718 A.2d 172, 177 n. 11 (D.C.1998) ("regulations of a defendant for guidance of its employees are admissible and may be considered on the issue of whether due care was exercised by the employee under the particular circumstances of the case") (citations omitted); *see also Clark, supra,* 708 A.2d at 636.

**14.** Dr. Cohen did not, however, identify any specific ACA, NCCHC, or APHA standards by paragraph number, or otherwise, nor did he quote from these organizations' standards. *Cf. Phillips, supra,* 714 A.2d at 773. In light of our disposition of the appeal on other grounds, we need not decide whether, in an action for medical malpractice, Dr. Cohen's reference to these standards by summarizing their content, standing alone, would have been sufficient.

The jury returned a verdict in the plaintiff's favor. Relying on *Meek v. Shepard, supra*, the District moved for judgment notwithstanding the verdict, claiming, as it does in the present case, that the expert had testified only to his own opinion, and that the plaintiff had therefore failed to establish the applicable standard of care. This court disagreed:

> In *Meek*, the expert witness "never testified as to the standard of care, but rather stated only what he would do under similar circumstances." [484 A.2d] at 581. Mitchell's case is different. Dr. Robb did not discuss how he would have treated the patient. His testimony presented a standard of care and a breach of that standard. Accordingly, we conclude that Mitchell was entitled to go to the jury on his malpractice claim.

533 A.2d at 649.

More recently, in *District of Columbia v. Watkins, supra*, an inmate claimed that the failure of the prison medical staff to provide him with pain-killing medication led to his temporary paralysis and to an accident that resulted from that paralysis. The plaintiff's expert, Dr. Lilly, testified in pertinent part as follows:

> Q. What would have been the standard of care for someone in Mr. Watkins' condition?
>
> A. I think that the standard of care for a patient with a long history of chronic pain; muscle spasms; unstable back, would be that a physician or a physician's assistant, or a nurse, or a medical practitioner of any degree, certainly should have attempted to provide [Watkins] with something to reduce his pain.

684 A.2d at 402. So far as the opinion of the court reveals, the foregoing passage was the substance of the plaintiff's evidence regarding the standard of care.

As in *Mitchell* (and in the present case), the District argued that the testimony of the plaintiff's expert did not establish the applicable standard. The evidence, according to

the District, represented only Dr. Lilly's personal opinion, and not "how other health care providers would treat patients under the circumstances." *Id.* This court again disagreed:

> [A] fair reading of Dr. Lilly's testimony does not support the argument that his testimony concerned what he would do personally under the circumstances.

✻ ✻ ✻ ✻

Although Dr. Lilly prefaced his opinion with "I think," the testimony, fairly read, expresses *the witness' opinion of the standard of care*, rather than what he would do himself. Viewed in the light most favorable to Watkins, the evidence was sufficient to allow a reasonable juror to find that a reasonably prudent physician would have provided Motrin or its equivalent to a patient in Watkins' condition.

*Id.* (emphasis added).

 Dr. Cohen's testimony regarding the standard of care was far more detailed than that of Dr. Robb in *Mitchell* and that of Dr. Lilly in *Watkins*.[15] The decisions in those two cases cannot be reconciled with the District's apparent view that, in order to establish a national standard of care, an expert witness in a prisoner's medical malpractice action against the District is required to enumerate the facilities across the country at which that standard is in effect, or to identify every authority on which he relies, quoting chapter and verse. If a properly qualified expert "expresses [his] opinion of [what] the standard of care [is]," *Watkins, supra*, 684 A.2d at 402, and if he or she provides adequate testimony as to breach and causation, then the evidence is sufficient to go to the jury.

 The District argues that Dr. Cohen was in error when he described the Asthma Guidelines as representing the standard of care in 1992, and it asks us to so find. But to paraphrase *In re Melton*, 597 A.2d 892, 903 (D.C.1991) (en banc), "the proper

---

15. In the present case, as in *Watkins*, the plaintiff's expert also used phrases such as "I would say" or "I believe" in describing the standard of care. The District focuses on this phraseology in

support of its claim that Dr. Cohen was merely expressing a personal opinion. We rejected this contention in *Watkins*, and we adhere to *Watkins* here.

inquiry is not what the court deems [the standard of care to be], but what experts in the relevant discipline reasonably deem it to be." (Citation omitted.) "The assumptions which form the basis for [Dr. Cohen's] opinion, as well as the conclusions drawn therefrom, are subject to rigorous cross-examination," and after that cross-examination has been conducted, the jury must be deemed to be intelligent enough to assess the reliability of the expert testimony. *Id.* (citation omitted); *see also District of Columbia v. Bethel,* 567 A.2d 1331, 1333 (D.C.1990) (rejecting the District's claim that the plaintiff's expert witness relied on allegedly improper materials to guide his expert opinion and that his testimony was therefore insufficient to establish the standard of care; the court found "no authority in support of [the District's] contention that a qualified expert's opinion can be undermined in this way").

Without addressing or even citing *Mitchell* or *Watkins,* the District relies on a line of cases such as *Phillips, supra,* 714 A.2d at 773–74, *Clark, supra,* 708 A.2d at 635–36; *District of Columbia v. Moreno,* 647 A.2d 396, 399 (D.C.1994); *District of Columbia v. Carmichael,* 577 A.2d 312, 314–16 (D.C.1990); and *Toy v. District of Columbia,* 549 A.2d 1, 6–8 (D.C.1988), in which we have been especially "demanding in requiring proof of a national standard of care." *Clark, supra,* 708 A.2d at 635 (citations omitted). In these cases, we have required the plaintiff's expert either to establish that the standard of care propounded by the expert is in use in many similar institutions or to identify with particularity the authorities on which he bases his determination of the applicable standard of care. None of these cases involved medical malpractice, however; rather, they presented claims that the District was negligent in failing to prevent a prisoner from committing suicide (*Phillips, Clark,* and *Toy* ), or to protect a prisoner from assaults by other inmates (*Moreno* and *Carmichael* ).

16. A review of several leading commentaries reveals no support for the imposition in medical malpractice cases of the kinds of "chapter and verse" requirements that the District is asking us to ordain. *See, e.g.,* W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 32, at 187–89 (5th ed.1984); 4 STUART M. SPEISER, ET AL., THE

The protection of an individual from himself, or from the criminal conduct of third parties, presents issues different in kind from those that arise in a medical malpractice case. This court has not applied the exacting standards described in cases like *Clark* to conventional medical malpractice litigation, and we do not know of any other court that has done so.[16] In asking us to transpose the *Clark* approach to the present context, the District is effectively attempting to revive its prior position, squarely rejected by this court in *Mitchell,* that "physicians who serve a prison population may be held to a standard of care different from the one imposed on physicians in other contexts." 533 A.2d at 648. Our comparatively recent decision in *Watkins,* however, demonstrates that *Mitchell* is alive and well, and we must therefore decline to adopt a position which ignores these precedents.

### (5) *Causation.*

The District also contends that even if Dr. Cohen's testimony was sufficient to establish the standard of care and its breach, the plaintiff failed to submit sufficient evidence of proximate cause to warrant submission of the case to the jury. We do not agree.

We had occasion, two years ago, to reiterate the applicable standard:

> To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable.

*Watkins, supra,* 684 A.2d at 402 (quoting *Psychiatric Inst. of Washington v. Allen,* 509 A.2d 619, 624 (D.C.1986)). Where the evidence, viewed in the light most favorable to the plaintiff, supports a rational finding of proximate cause, the issue is one of fact for the jury. *Watkins, supra,* 684 A.2d at 403.

AMERICAN LAW OF TORTS § 15:12, at 393–96 (1987); MICHAEL D. McCAFFERTY, MEDICAL MALPRACTICE: BASES OF LIABILITY §§ 2.28–.30 (1985). Indeed, the District has cited no malpractice case, and we have found none, in which such an approach was even suggested.

In the present case, after explaining the applicable standard of care, Dr. Cohen testified that Brown's death was "wholly preventable," and that if Brown had received adequate care, he probably would not have died. Dr. Cohen's testimony regarding proximate cause was sufficient to require submission of the issue to the jury.

## II.

### THE CLAIM OF INSTRUCTIONAL ERROR

At the trial of this case, the plaintiff introduced evidence showing that at least two foreign medical graduates not licensed as physician assistants provided treatment to Russell Brown. At the time of Brown's death, District law provided in pertinent part, with exceptions not here applicable, that "[a] license issued pursuant to this chapter is required to practice medicine ... or to practice as a physician assistant ... in the District." D.C. Code § 2–3305.1 (1994).[17] Violators are subject, *inter alia*, to criminal penalties. § 2–3310.7.

 The judge explained to the jury that the District had a statute requiring a license to practice as a physician assistant, and he then instructed the jurors:

If you find that a statute intended to protect the public has been violated and thereby caused injuries which the statute

**17.** The statute was slightly amended in 1995 in respects not here material. *See* annotation to D.C.Code § 2–3305.1 (Supp.1998).

**18.** The plaintiff claims that the District waived its objection to the instruction that it now challenges. This contention is without merit.

Although counsel for the District stated, after the judge had instructed the jury, that he was satisfied with the charge, this statement must be considered in context. During the earlier discussion of proposed instructions, counsel had made it clear on at least two occasions that, in the District's view, the "negligence *per se*" instruction should not be given. This was sufficient to preserve the District's position, and counsel was not required to repeat his objection for a third time after the judge had instructed the jury. "The failure to object may be disregarded if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing." *Thoma v. Kettler*

intended to avoid, then you must find negligence.

The District contends that the unlicensed physician assistants did not practice "in the District," that the statute was therefore inapplicable, and that the construction based on the statute was necessarily erroneous.[18]

Lorton cannot be found on a map of the District of Columbia, and in that literal sense, the Youth Center is not "in the District." Nevertheless, the question whether DOC employees at Lorton are covered is hardly open and shut. Lorton is a District prison—indeed, it is the District's principal correctional institution. The Youth Center, like other parts of the facility, is operated by District personnel. As the District points out in its brief, "there is nothing in the record showing that physician assistants at the Youth Center were subject to licensure under Virginia law."[19] It is surely a dubious proposition to suggest, as the District does, that no licensing requirement at all applies at Lorton, and that a butcher (or baker or candlestick maker), without any medical training, may perform brain surgery there without running afoul of the law.

 Literalism has its limits and, as Judge Learned Hand has written,

it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some

*Bros., Inc.*, 632 A.2d 725, 727 n. 3 (D.C.1993) (quoting 9 CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2553, at 639–40 (1971)). "To require plaintiffs to object [again] after the instructions were given is to require a pointless formality." *Brown v. AVEMCO Investment Corp.*, 603 F.2d 1367, 1371 (9th Cir.1979).

To the extent that language in *Watts v. Smith*, 226 A.2d 160, 163 (D.C.1967), may be contrary to the cited authorities, that language was unnecessary to the disposition of the case, and we do not follow it. *See, e.g., Albertie v. Louis & Alexander Corp.*, 646 A.2d 1001, 1005–06 (D.C.1994) (explicating why dictum is not binding). Moreover, the dictum in *Watts*, if construed as plaintiff reads it, appears to be inconsistent with prior binding authority. *See Harlem Taxicab Ass'n v. Nemesh*, 89 U.S.App. D.C. 123, 125, 191 F.2d 459, 461 (1951).

**19.** According to the District, Lorton Reformatory was ceded to the United States pursuant to the Enclave Clause, U.S. CONST., art. I, § 8, cl. 17.

purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

*Cabell v. Markham,* 148 F.2d 737, 739 (2d Cir.), *aff'd,* 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). We have recognized the force of Judge Hand's reasoning. *See, e.g., James Parreco & Son v. District of Columbia Rental Hous. Comm'n,* 567 A.2d 43, 46 (D.C.1989) (quoting *Cabell*). Statutory construction is, at bottom, designed to ascertain the "original intent and meaning of the makers," *District of Columbia v. Jerry M.,* 717 A.2d 866, 873 (D.C.1998) (citation omitted), and it is difficult to understand why the legislature would have intended to require physician assistants to be licensed in order to work at the D.C. Jail, but not if they were employed at Lorton.[20]

Moreover, the District has treated the statute, or at least the policy underlying the statute, as applicable to Lorton. The DOC's "Foreign Medical Graduate Guidelines," which apply to "all Health Services Personnel," provide in pertinent part as follows:

1. A Foreign Medical Graduate/Physician Assistant shall perform all administrative tasks in his/her official position description *that comply with all District of Columbia licensing regulations.*

2. Foreign Medical Graduates (PA) shall be assigned to assist in the delivery of clinical services, subject to licensure restrictions.

\* \* \*

4. Foreign Medical Graduates *shall not* provide direct patient care in the form of an examination, diagnosis and treatment of patient.

DOP 6049, *supra,* (emphasis added to paragraph 1; emphasis in original of paragraph

4). DOP 6049 further states that "Chief Medical Officers and Supervisory Physician Assistants shall insure strict compliance with this order."

The use of unlicensed physician assistants was also prohibited by court orders which had been entered by consent in at least two federal lawsuits brought by inmates seeking to remedy allegedly unconstitutional prison conditions, one case relating to Lorton's Central Facility,[21] and the other to the Occoquan facility.[22] Dr. Cohen testified that the monitors appointed by the court to ensure implementation of the decrees "were extremely critical of the continuing use of foreign medical graduates as [physician assistants] in the Central and Occoquan facilities." These decrees did not, by their terms, apply to the Youth Center, but as the trial judge explained in overruling the District's objection to their admission, "if it's a court order in Central, they have to know in the Youth Center they can't use them. At least that argument can be made." Dr. Cohen also testified that "[t]here appears to be a single health service, with a single director, for the entire range of facilities that are operated by the D.C. Department of Corrections."[23]

■ Under these circumstances, we conclude that even if the licensing statute, reasonably interpreted, does not apply to Lorton—an issue we do not decide—any error on the judge's part with respect to that question was harmless. The jurors were apprised of the provisions of DOP 6049, which applied to *all* DOC facilities, including the Youth Center. DOC's unified Health Services Division was subject to court orders—enforceable through the court's contempt power—allowing the use of foreign medical graduates as physician assistants only where such use complied with applicable statutes and agency rules. We discern no apprecia-

---

**20.** *But cf.* D.C.Code § 36–303(e) (1997), which specifically provides that the requirements of the worker's compensation statute apply to nonprisoners employed in a prison industries program at a District correctional facility, *"whether within the District or elsewhere."* (Emphasis added.)

**21.** *Twelve John Does v. District of Columbia,* C.A. No. 80–2136 (D.D.C.).

**22.** *Inmates of Occoquan v. Barry,* C.A. No. 86–2128, 1987 WL 13349 (D.D.C.).

**23.** Dr. Cohen further stated that in 1992, there was no professional health staff on duty at the Youth Center during the evening and nighttime hours, so that patients had to be taken to Lorton's Central Facility or to Occoquan. Russell Brown, however, was never treated at either of these facilities.

ble possibility that, in light of all of these proscriptions, the jury would have concluded, even in the absence of the judge's challenged instruction, that the District exercised due care when it allowed foreign graduates, who were not properly licensed, to practice as physician assistants and to treat Russell Brown.[24] Moreover, there was substantial additional evidence of negligence on the part of the District and its agents.

Appellate courts are no longer "impregnable citadels of technicality." *R & G Orthopedic Appliances and Prosthetics, Inc. v. Curtin,* 596 A.2d 530, 539 (D.C.1991) (citation omitted). The District was entitled to a fair trial, not to a perfect one. *Id.* at 538. "The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Super. Ct. Civ. R. 61. We conclude on this record that the alleged error as to the geographical coverage of the statute, if error at all, did not change the outcome of the trial or impair the District's substantial rights.[25]

### III.

### CONCLUSION

For the foregoing reasons, the judgment is *Affirmed.*

---

**24.** The District introduced evidence showing that two of the foreign medical graduates had practiced as physicians or physician assistants in the Dominican Republic and were qualified to treat asthma patients. That evidence bears on the question whether any violation of the licensing statute proximately caused Brown's death, but has little if any relevance to the legal issue whether the District's violation of § 2–3305.1 constituted negligence.

**25.** The District also contends that, even if § 2–3305.1 applies to District employees at Lorton, the judge erred in instructing the jury that a violation of the statute constitutes negligence *per se.* "This area of the effect of the violation of a statute, ordinance or administrative regulation in the law of negligence is one in which, indeed, angels fear to tread." 2 STUART M. SPEISER, ET AL., THE AMERICAN LAW OF TORTS § 9.8, at 1023–24 (1985) (quoting ALEXANDER POPE, AN ESSAY ON CRITI-

CISM (1711)). *Compare Baldwin v. District of Columbia,* 183 A.2d 566, 568 (D.C.1962) ("One who fails to submit himself to the scrutiny of the Board of [Medicine] must be considered unfit to practice [medicine] regardless of his claimed qualifications") *and Whipple v. Grandchamp,* 261 Mass. 40, 158 N.E. 270, 272 (Mass.1927) ("[t]he [medical licensing] statute therefore must be construed as [having been] intended to afford relief by way of damages to all persons suffering harm where the violation of the statute is the proximate cause of their injuries") *with Hardy v. Dahl,* 210 N.C. 530, 187 S.E. 788, 791 (N.C.1936) ("in a civil action bottomed upon the law of negligence, the failure to possess a state certificate is immaterial on the question of due care"). Because we have concluded that any error in the challenged instruction was harmless, we need not decide whether the judge's charge regarding negligence *per se* was correct.