**DISTRICT OF COLUMBIA, Appellant,**

v.

**Walter PRICE, Appellee.**

**No. 99–CV–1044.**

District of Columbia Court of Appeals.

Argued June 15, 2000.
Decided Sept. 14, 2000.

James C. McKay, Jr., Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellant.

Angela Ciccolo, Washington, DC, for appellee.

Before SCHWELB and FARRELL, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

This negligence action arises from an automobile accident that occurred on the morning of March 21, 1994, when appellee Walter Price collided with a utility pole after apparently having suffered a stroke at the wheel. Mr. Price alleges that he was injured as a result of the failure of an officer of the District of Columbia Metropolitan Police Department (MPD) to seek immediate medical attention for him. After a four-day trial, the jury found that the District was negligent and awarded Price $200,000 in damages. Contending that the evidence adduced by Mr. Price was insufficient as a matter of law to prove causation, the District appeals from the trial court's denial of its post-trial motion for judgment as a matter of law (JMOL). We reverse.[1]

## I.

### THE FACTS

On the morning in question, Officer Michael Petty of the MPD received a report of an accident with injuries. Officer Petty responded to the scene at approximately 9:30 a.m., and he found Mr. Price sitting in his truck. Price's pupils were dilated, he had a blank stare, and his speech was slurred. When Mr. Price got out of the truck, he fell to the ground. Petty claimed that he detected a "slight odor of alcohol"

on Price's breath, and it appeared to Petty that Price was intoxicated. Further investigation revealed that Mr. Price's driver's license had been revoked, and at 10:16 a.m., Officer Petty arrested him for operating a motor vehicle after revocation and on suspicion that he had been driving while intoxicated. Officer Petty then called for a mobile alcohol cruiser to administer a breathalyzer test, but no cruiser was available. Price testified that he told Petty at the scene that he (Price) had suffered from high blood pressure and that he wanted to go to the hospital. Price alleged that his request was refused.[2]

Officer Petty then drove Price to the Traffic Division. Price testified that he advised the desk sergeant that he needed to go to the hospital. He claimed, however, that the officer told him that he must first take the breathalyzer test. Mr. Price stated that he was handcuffed to a chair, that he asked several times to go to the bathroom, and that the officers would not let him do so; this resulted in involuntary incontinence. Three breathalyzer tests were administered to Mr. Price, and all three were negative for the presence of alcohol. The last breathalyzer test was completed at 11:34 or 11:35 a.m. Immediately thereafter, Price complained for the first time of a new symptom, namely that he was now unable to move his left arm.

Officer Petty asked Price if he wanted to go to the hospital, and Price replied that he did. Petty then called for an ambulance, and the ambulance left Georgetown University Hospital at 11:59 a.m., arriving at the station at 12:16 p.m. Price was examined at the station, and the ambulance crew confirmed that he was suffering from paralysis on his left side. Price was driven by ambulance to the hospital, arriv-

---

1. Our disposition renders it unnecessary for us to consider the District's other claim on appeal, namely, that the trial court erred by permitting plaintiff's medical expert to read to the jury certain hearsay statements of the plaintiff's treating physicians.

2. According to Mr. Price, Petty said "well boy, you['re] drunk."

ing there at 12:30 or 12:35 p.m. At this point, Price could not move his left hand, the left side of his face was numb, and he had to drag his left leg in order to walk.

At the hospital, Price was given a CAT scan [3] to identify the appropriate treatment. This diagnostic examination was necessary in order to determine whether administration of "Heparin," a blood thinner, would be appropriate. Heparin cannot undo the damage from a prior stroke, but it can prevent further blood clots from forming. If a patient has suffered a cerebral hemorrhage and is bleeding from the brain, however, the administration of Heparin is inappropriate and may kill the patient. Before treating Mr. Price with Heparin, hospital personnel therefore had to find out whether he had suffered a cerebral hemorrhage. In this case, the CAT scan revealed that Price was not bleeding from the brain and, at 1:40 p.m., Heparin was administered to him. By this time, his left side had already been paralyzed for approximately two hours.

At trial, Price introduced expert testimony which, if credited, established that he had suffered two distinct neurological episodes, or strokes.[4] The first episode injured Price's brain stem and caused his dizziness and vertigo, as well as the loss of consciousness that resulted in the accident. The second stroke affected the right side of his brain, causing the left-side paralysis. Price's theory at trial was that his second (and paralytic) stroke was proximately caused by the District's negligence in failing to obtain treatment for him in time.

Price testified that he remained at Georgetown University Hospital for about a month and that he was treated at the National Rehabilitation Hospital for approximately one year. He stated, *inter alia*, that he could no longer drive a car or play on his "old man basketball team." The jury found that the District's negligence caused Mr. Price's injuries and, as previously noted, awarded him $200,000.

## II.

### LEGAL DISCUSSION

■ When reviewing the denial of a defendant's motion for judgment as a matter of law, we view the record, and all reasonable inferences from the evidence, in the light most favorable to the plaintiff, and we reverse only if no impartial juror could reasonably reach a verdict for the plaintiff. *See, e.g., Grant v. District of Columbia*, 597 A.2d 366, 370 (D.C.1991). Judgment as a matter of law is warranted, however, if the plaintiff has failed to present evidence on any element of his case sufficient to permit a reasonable jury to find in his favor. *Id.*

■ In order to show negligence, a plaintiff must establish, by a preponderance of the evidence, the applicable standard of care, a breach of that standard by the defendant, and a causal relationship between the breach and the plaintiff's injury. *See District of Columbia v. Wilson*, 721 A.2d 591, 597 (D.C.1998). When the applicable standard of care is "beyond the ken" of the average juror, the plaintiff must ordinarily prove each element by expert testimony. *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C.1981); *see also Meek v. Shepard*, 484 A.2d 579, 581 n. 4 (D.C.1984). In this case, it was undisputed that expert testimony was required.

Robert Klotz, Price's expert witness on the subject of police practices, described the applicable standard of care. Mr. Klotz testified that when it is difficult to determine whether a prisoner in custody is ill or

3. "CAT scanning" (Computed Axial Tomography) combines the use of a digital computer with a rotating x-ray device to create detailed cross sectional images or "slices" of different organs.

4. The District's expert testified that, in his opinion, Price had suffered only one stroke. For purposes of the District's JMOL motion, however, we must credit the testimony of Price's expert that the patient had experienced two separate neurological episodes.

intoxicated, or when a prisoner has become ill at the police station, the national standard of care requires police officers to obtain immediate medical attention for the prisoner. A similar obligation is imposed by the municipal regulation governing the conduct of police officers. *See* 6A DCMR § 700.4 (1998) ("Where the condition of a prisoner is such that it is difficult to determine whether he or she is ill or intoxicated, or when a prisoner is taken ill in a station, he or she shall be immediately conveyed to a hospital."). Section 700.4 was brought to the attention of the jury without objection from the District.

Mr. Klotz also testified that there had been a deviation from the national standard. He explained that before Officer Petty responded to the scene, Petty was advised that there had been an accident with injuries. Under these circumstances, according to Klotz, Officer Petty should have called an ambulance to the scene "immediately upon coming at the scene of the accident." The testimony of Mr. Klotz, if credited, was sufficient to establish the standard of care and a deviation therefrom. Indeed, the District makes no claim that it is entitled to a JMOL with respect to either of these elements of the plaintiff's case.

■ The District does, however, challenge the sufficiency of the plaintiff's showing of causation. "To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *Wilson, supra,* 721 A.2d at 600 (citations omitted).

> Proximate cause may be divided into a cause-in-fact (causation) element and a policy element. The cause-in-fact requirement assures that no defendant will be liable unless he has in fact caused the

plaintiff's harm. The policy element includes various liability-limiting considerations which relieve the defendant of liability for harm he actually caused where the chain of events appears "highly extraordinary in retrospect." *See* Reporter's Notes to § 433, Restatement (Second) of Torts, 3 app., at 129 (1966).

*Lacy v. District of Columbia,* 424 A.2d 317, 320–21 (D.C.1980) (footnote omitted).

■ If the harm suffered by a plaintiff would have occurred even in the absence of the defendant's negligence, then the defendant's conduct was not a cause-in-fact of that harm. The dispositive issue in this case is whether an impartial jury could reasonably find Price's injuries were, in fact, caused by the District's negligence, or whether, on the contrary, Mr. Price would have suffered the same harm even if the District had exercised due care. The District contends that even if all issues of fact are resolved in Price's favor,[5] the evidence conclusively shows that the District's alleged negligence did not cause Price's second stroke or paralysis. According to the District, Price's second stroke must have occurred at approximately 11:35 a.m. (if not before), for it was at that time that the final breathalyzer test was completed and Price complained of weakness or paralysis on his left side. The undisputed evidence therefore demonstrates, says the District, that even if the police had exercised due care, Heparin could not reasonably have been administered to Price in time, and the paralytic stroke therefore could not have been averted. The District's position has merit.

■ The parties agreed at trial that Officer Petty had no obligation to call an ambulance until 10:16 a.m., when Price was placed under arrest.[6] It took forty-five minutes from the time the ambulance was called for the ambulance crew to drive the vehicle to the station, to examine Mr. Price, and to transport him to Georgetown

---

**5.** The only significant factual disputes are (1) whether Price requested to be taken to the hospital at the scene of the accident, and (2) whether he suffered one stroke, as the Dis-

trict's medical expert testified, or two separate strokes, as plaintiff's expert opined.

**6.** In fact, the jury sent a note asking: "Is the District responsible on any actions or omis-

University Hospital. Dr. Bruce Ammerman, the District's medical expert, testified that this forty-five minute period was typical of the time that it would take to carry out this task. Counsel for Price did not cross-examine Dr. Ammerman on this subject, and Dr. Stanley Malkin, the plaintiff's medical expert, was unable to say whether the time that the ambulance crew took to pick up Price, to examine him, and to transport him to the hospital was normal or abnormal. Accordingly, there was no evidence from which the jury could fairly find that the ambulance crew's response time in this case was unreasonable. In any event, the speed with which an ambulance crew carries out its responsibilities is not within the MPD's control.

In addition, both Dr. Malkin and Dr. Ammerman testified that it was necessary for hospital personnel to conduct a CAT scan before Heparin could be administered. The patient having arrived at the hospital at about 12:30 p.m., the two experts were of the opinion that the administration of Heparin at 1:40 p.m. was accomplished "very quick[ly]" (Dr. Ammerman) and with "due haste" (Dr. Malkin). The two doctors also agreed that Heparin could not dissolve a blood clot, or "undo the damage," but could only prevent further blood clots from forming. The time that elapsed between Price's arrival at the hospital and his treatment with Heparin was thus also unavoidable, and, in any event, the MPD had no control over how quickly the diagnostic examination could be completed.

The significance of the sequence of events is apparent. Even if Officer Petty had called for medical attention at precisely 10:16 a.m., as Price claims that Petty should have done, the conclusion is inescapable that Price nevertheless would not have received Heparin in time to avoid the

second stroke. The undisputed evidence shows that it took about forty-five minutes to transport Price to the hospital, and an additional hour and ten minutes or so to clear him for the administration of Heparin. There was no evidence that these times were unreasonable or abnormal under the circumstances, or that the District could have done anything to speed up activities that were entirely outside the MPD's control. Under the circumstances, Price could not have been treated with Heparin for almost two hours after the police called the ambulance, or well after noon on the day in question. By that time, Price had already suffered the stroke that caused paralysis on his left side.

We find ourselves in agreement with the following statement by the Supreme Court of Connecticut:

> Drawing logical deductions and making reasonable inferences from facts in evidence, whether that evidence be oral or circumstantial, is a recognized and proper procedure in determining the rights and obligations of litigants, but to be logical and reasonable they must rest upon some basis of definite facts, and any conclusion reached without such evidential basis is a mere surmise or guess. The ... character of the plaintiff's injuries naturally tended to create sympathy and a leaning toward a plaintiff's verdict, but for the reasons given we are unable to find in the evidence a sufficient basis for it, and the motion to set it aside should have been granted.

*Paige v. Saint Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 734 A.2d 85, 95–96 (1999) (citing *Latham v. Hankey*, 117 Conn. 5, 166 A. 400, 401–02 (1933)) (internal quotation marks and brackets omitted). Even if the police had called an ambulance at the earliest possible moment, Price still would not have received Heparin

---

sions prior to 10:16 a.m.?", to which the [c]ourt replied "[t]he answer is no." The plaintiff interposed no objection to this response and has not challenged it on appeal. *See generally Powell v. District of Columbia*, 602 A.2d 1123, 1128 (D.C.1992) (discussing "public duty" doctrine); *cf. Spencer v. Gener-*

*al Hosp.*, 138 U.S.App. D.C. 48, 52–53, 425 F.2d 479, 483–84 (1969). The issue having been conceded, we have no occasion to decide whether the public duty doctrine applied at all where, as here, Price was evidently not free to leave during Officer Petty's investigation.

until after he had exhibited the symptoms of the second stroke. The police could not make an ambulance arrive more quickly or medical procedures involving a CAT scan take less time. We are thus constrained to conclude, as a matter of law, that, on the record before us, the second stroke would have occurred even if the District had not been negligent. Under these circumstances, Price cannot prevail.[7]

## III.

### CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed, and the case is remanded with instructions to grant the District's motion for judgment as a matter of law.

*So ordered.*

---

7. Plaintiff's medical expert, Dr. Malkin, testified that Mr. Price's second stroke was caused by the MPD's three-hour delay. He stated that, but for that delay, the patient would have been on blood thinning medication in time to avert the second "neurological event." Dr. Malkin's conclusion, however, did not take into account undisputed aspects of the record, including the parties' agreement that the police had no obligation to call an ambulance until Price was placed under arrest at 10:16 a.m. Dr. Malkin acknowledged that "[t]he second stroke had to occur by the time they loaded the patient into the ambulance because the ambulance people noted that he had left-sided weakness." He provided no explanation how, in light of the inevitable delays required by the need for the ambulance and for the CAT scan, Heparin could have been administered before Price felt the paralytic effects of the stroke at approximately 11:35 a.m.